[Crim. No. 6069.    In Bank.    Sept. 17, 1957.]

THE PEOPLE, Plaintiff and Appellant, v. RODNEY G. SHERAN, Defendant and Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, Victor Griffith, Deputy Attorney General, William O. Weissich, District Attorney (Marin), and Roger Garety, Assistant District Attorney for Plaintiff and Appellant.

Bagshaw, Schaal, Martinelli & Talley, Bagshaw, Schaal & Martinelli and Thomas E. Schaal for Defendant and Appellant.

CARTER, J.—Defendant, Rodney G. Sheran, was found guilty by a jury of the second degree murder of his wife, Esme.[1]  Defendant's motion for a new trial on the ground of newly discovered evidence was denied by the trial court which, however, granted defendant's motion to modify the verdict by reducing the crime from second degree murder to manslaughter.  The People appeal from the order reducing the class of the crime; defendant appeals from the order denying his motion for a new trial.[2]

The body of a deceased woman was found at approximately 10:30 on the morning of May 26, 1955, lying on a fire road in the hills of Marin County about four miles from Fairfax. The record shows that the body was identified later that day as Esme Sheran, the wife of the defendant; that her death had been caused by crushing blows to the head which, in the opinion of the autopsy surgeon, could have been caused by several large blood-stained rocks found near the body.  It was the opinion of the autopsy surgeon that the death had occurred between 6 p. m. and midnight of May 25, 1955. There was no alcohol in the blood of the deceased woman; there was no evidence of any sexual attack or of any struggle having taken place; the clothing was clean and untorn; the body was free of bruises and the fingernails were long and unbroken.  A pair of broken colored glasses was found near the body of the deceased.

A search of the Sheran apartment at Greenbrae, Marin

[1]Defendant pleaded not guilty and later was permitted to plead not guilty by reason of insanity. The latter plea was, however, withdrawn.

[2]The notice of appeal declares that defendant also appeals from the judgment but this, apparently, has been abandoned since the briefs are concerned only with the order denying his motion for a new trial.

County, on May 26th, revealed a note in the defendant's handwriting which read: "Dear Esme: I have decided to leave for a few days, so don't feel hurt if I'm not here when you return. I will mail you a check, and also one for the rent, so don't worry. All my love, Rod." A woman's handbag containing the decedent's driver's license and other articles and keys was also found in the apartment.

Mrs. Potter, a neighbor of the Sherans, testified that she had seen them both in the vicinity of their apartment on the afternoon of May 25th; that she had seen Mrs. Sheran for the last time shortly before 5 p. m., and the defendant some 20 minutes earlier. She testified that earlier in the afternoon the defendant had asked her if she would like to earn 50 cents an hour digging his grave. Another neighbor testified that she had seen the defendant sitting in his red pickup truck across from the apartment about 4:30 on the afternoon of May 25th and that she had seen the decedent a few minutes earlier. James Oliver testified that the defendant, with whom he had been acquainted for several years, had entered his store at Pt. Reyes Station in Marin County at about 7 p. m. on the night of May 25th and that he had at that time purchased a bottle of sweet vermouth and a bottle of Burgundy wine and that he had then driven off in the direction of Olema and San Rafael. Captain Volk of the Larkspur police department testified that he had seen the defendant in his truck in the Greenbrae area at approximately 11:30 p. m. on May 25th; that he had not recognized the defendant's truck and had stopped him; that defendant conversed with him and that he appeared perfectly normal; that he had known the defendant for some time. All of the witnesses testified that defendant seemed perfectly normal when they had seen him and that he was not under the influence of alcohol.

The defendant was picked up in his pickup truck in Oregon about 180 miles north and east of the California border on May 28, 1955. When the officer who arrested him told him that he was wanted in California and that he "imagined" the defendant knew "what for," the defendant replied "I think so," or "I imagine so." The officers testified that on May 28th in the county jail in Vale, Oregon, the defendant, in response to questions, stated that he last remembered seeing his wife Esme in their apartment when she gave him a package of cigarettes; that they got into the red pickup truck and went to a store in San Anselmo where he waited while she went inside; that they then drove to the hills

and got out of the truck, that an argument started and that after that everything went "blooey." When defendant was picked up in Oregon, the officers testified that his clothing was dirty and shabby; that he was unshaven and appeared very tired. The Oregon officers testified variously that defendant's knuckles were "scarred," "bruised" and "lacerated." On the right-hand side of the seat in the cab, were articles of clothing on wire hangers and a hand-axe as well as a small, tan plastic suitcase; on the floor was a partially empty can of beans which had been opened with something which had left a jagged edge; a paper bag with some food articles was also found in the truck cab. Several rocks were also found in the cab of the truck. The canvas top covering the bed of the truck was missing[3]; and the cardboard liner from the inside of the cab was in the back part of the truck.

All tests made on defendant's clothing, person and the truck were negative.

At the trial defendant testified that after his wife got out of the truck in San Anselmo he remembered nothing; that he did not recall driving to Pt. Reyes and making his purchases from Mr. Oliver; that he did not remember being stopped by Captain Volk in Greenbrae. He testified that he did not remember driving into the hills; that he did not recall hitting his wife with either his fists or with rocks; that he did not remember writing the note to his wife; that he did not tell the Oregon officers that he and his wife had an argument and that after that everything had gone "blooey." Concerning the condition of his knuckles he testified that he told the officers it could have occurred while he was opening a can of food, or at his work of bulldozing. Defendant testified that his first recollection after stopping at the store in San Anselmo was waking up in "a valley" and later being on a highway outside of Boise, Idaho.

The record shows that defendant had, some two or three years prior to the time of his arrest, been committed to Napa State Hospital at the instigation of his wife. He testified that when he was arrested in Oregon he thought it was probably because his wife had put out a wanted call for him and that she had "sworn out a warrant to probably return me to Napa." His testimony was to the effect that his

[3]The witnesses who had last seen him testified that the canvas cover was on the truck on May 25th.

head had felt "fuzzy" while he was waiting for his wife outside the San Anselmo store; that he thought maybe she had given him a cigarette containing marijuana. He testified that after waking up outside of Boise, Idaho, the next thing he remembered was the officer who stopped him where he was parked off the highway in Oregon fixing a headlight on his truck; that he was driving the truck in the same direction as the officer had gone when the officer, who had turned and was coming back, motioned him to stop and told him he was under arrest. Defendant testified that while he was in the Oregon police officer's car he heard two broadcasts on the radio which informed the police that he had been apprehended and that he was wanted for murder in California. He testified that after the first broadcast he thought he might have hit somebody or run over them with his car; that after the second broadcast he remarked to the officer that "I hope they know what they're talking about because I certainly don't." Defendant's testimony concerning the manner of his arrest and his statements was corroborated by the arresting officers.

The medical testimony on behalf of the People was to the effect that if defendant suffered from amnesia it was probably of the hysterical type brought on by some great emotional shock, traumatic experience or fear; that such an amnesia would be of the retrograde type which would extend back to some period preceding the shock, traumatic experience or fear which caused it. In the expert's opinion it was "just as likely" that defendant was malingering as it was that he was suffering from retrograde amnesia.

The evidence heretofore set forth is substantially all of the evidence and is entirely circumstantial. The testimony taken before the grand jury is part of the record and contains evidence given by defendant's mother wherein she stated that defendant was in great fear of being returned to Napa and that he had said that he would rather be dead than go back there. The only evidence directly, or indirectly, linking defendant with the crime is that he was seen leaving the Greenbrae area with his wife in the truck, and his statement to the Oregon officer that he drove her into the hills where an argument started and that thereafter everything went "blooey."

The People contend that a trial court does not have the power under section 1181, subdivision 6, of the Penal Code to weigh the evidence in order to modify a verdict or judgment.

Section 1181, subdivision 6, provides: "When a verdict has been rendered against the defendant, the court may, upon his application, grant a new trial, in the following cases only: . . . 6. When the verdict is contrary to law or evidence, but if the evidence shows the defendant to be not guilty of the degree of the crime of which he was convicted, but guilty of a lesser degree thereof, or of a lesser crime included therein, the court may modify the judgment accordingly without granting or ordering a new trial, and this power shall extend to any court to which the cause may be appealed; . . ."

The People rely on *People* v. *Daugherty*, 40 Cal.2d 876, 884, 885 [256 P.2d 911], *People* v. *Sutic*, 41 Cal.2d 483, 493 [261 P.2d 241], and *People* v. *Jones*, 136 Cal.App.2d 175, 194 [288 P.2d 544], for the proposition that the trial court may not weigh the evidence in order to modify the judgment but is held to the same rule applicable to appellate courts: that if there is substantial evidence in support of the judgment the court may not interfere with the verdict of the jury. In the Daugherty case we were concerned with the rule applicable to appellate courts and we specifically stated that "The test on appeal is whether there is substantial evidence to support the conclusion of the trier of fact. It is not whether guilt is established beyond a reasonable doubt."

Even though the following language in the Sutic case is susceptible of the construction placed on it by the People, the opinion, when read in its entirety shows that this court was considering the duty and power of an appellate court. It was there said: "As above discussed, the evidence fully justified the jury's finding that the homicide was the result of defendant's intent to kill and was accomplished by his 'lying in wait' until the opportune time to strike, *or* that the homicide was a 'willful, deliberate, and premeditated' act, without finding as to 'lying in wait.' In either event it was murder in the first degree. . . . Under such circumstances neither the trial court nor this court would be authorized to reduce the degree of the crime. (*People* v. *Daugherty*, 40 Cal.2d 876, 884-886 [256 P.2d 911].)" This statement was in answer to defendant's contention that the degree of the crime should be reduced on the ground that the evidence was insufficient to indicate that he had the requisite intent to justify a verdict of first degree murder. His motion for a reduction had been denied by the trial court. This court was there pointing out that the evidence was sufficient to support the determination of the trial court in denying de-

fendant's motion for a new trial and for reduction of the degree of the crime. In other words, under the circumstances there presented, it was exercising its appellate function. The reverse situation is presented in the case at bar since the trial court here granted defendant's motion to reduce the degree of the crime and we are concerned with the propriety of its decision in that respect. *People* v. *Jones, supra*, 136 Cal.App.2d 175, 194, is also of no aid to the People. It was there said: "It is also futile to consider that the version of a deliberate killing does violence to the great portion of the testimony in the cause, for when *we* address ourselves to the sufficiency of the evidence *we* are concerned, not with preponderance, however great it may be, but only with substantial support, giving to the jury their right to select from the testimony those parts which they believe to state the truth." (Emphasis added.) Again, it is apparent that the appellate court was there dealing with its own duties and power.

The correct rule is that stated in *People* v. *Thomas,* 25 Cal.2d 880, 904, 905 [156 P.2d 7], where we were construing the effect of section 1181, subdivision 6 of the Penal Code. In the Thomas case we had before us the question of the power of an appellate court to weigh the evidence in reducing the degree or class of a crime. We said: "While the *power* granted to the appellate court is equal to that given the trial court the circumstances which will justify its exercise in a particular court are those which are appropriate to typical functioning of that court. In other words, upon an application to reduce the degree or class of an offense, a trial judge may review the *weight* of the evidence but an appellate court should consider only its *sufficiency as a matter of law.* This is in accord with the general rule stated in *People* v. *Holt* (1944), *supra, ante,* pages 59, 70 [25 Cal.2d 59 (153 P.2d 21)]: 'The function of the jury was to appraise the weight of the evidence; ours is to appraise its legal adequacy' and (p. 90) 'While the jury is given the function of determining the facts upon the evidence it does not have the power of changing the standard [as to what constitutes murder of the first degree as distinguished from murder of the second degree].' Implications to the contrary in *People* v. *Howard* (1930), *supra,* 211 Cal. 322, 330 [295 P. 333, 71 A.L.R. 1385], are disapproved. Having examined the record in this case we do not feel constrained to hold that the evidence is legally inadequate to support a verdict of murder of the first degree.

Hence, we are not authorized to reduce the judgment under our view of section 1181(6) of the Penal Code." (Emphasis that of the court.)

█ In passing upon a motion for a new trial on the ground of insufficiency of the evidence the rule is that "[I]t is the exclusive province of the trial court to judge the credibility of the witnesses, determine the probative force of testimony, and weigh the evidence [citations]. █ In considering the sufficiency of the evidence upon such motion the court may draw inferences opposed to those drawn at the trial [citation], and where the only conflicts consist of inferences deduced from uncontradicted probative facts, the court may resolve such conflicts in determining whether the case should be retried [citation]. █ It is only where it can be said as a matter of law that there is no substantial evidence to support a contrary judgment that an appellate court will reverse the order of the trial court." (*Brooks* v. *Metropolitan Life Ins. Co.*, 27 Cal.2d 305, 307 [163 P.2d 689]; *Richardson* v. *Ham*, 44 Cal.2d 772, 775 [285 P.2d 269].)

█ In *People* v. *Robarge*, 41 Cal.2d 628, 633 [262 P.2d 14], this court said that "While it is the exclusive province of the jury to find the facts, it is the duty of the trial court to see that this function is intelligently and justly performed, and in the exercise of its supervisory power over the verdict, the court, on motion for a new trial, should consider the probative force of the evidence and satisfy itself that the evidence as a whole is sufficient to sustain the verdict."

█ The power given by the statute (Pen. Code, § 1181, subd. 6) to the trial court is to be exercised as that court typically functions (*People* v. *Thomas*, 25 Cal.2d 880, 904, 905 [156 P.2d 7]). The section in effect provides that in lieu of granting a new trial, the trial court may reduce the degree or class of the crime if the evidence shows that the defendant is guilty of a lesser degree or of a lesser crime. Inasmuch as the trial court is given both the power to grant a new trial or reduce the degree or class of the crime in the same section, it would appear that the trial court's exercise of the power is the same in both cases.

The second question which presents itself is whether there is evidence in the record, or inferences to be drawn from that evidence, to support the trial court's determination that the defendant was guilty of no greater crime than manslaughter. █ Unless we can say as a matter of law that there is no evidence in the record, and that no inference can be drawn

from the evidence contrary to those drawn by the jury, we must affirm its order reducing the class of the crime.

The People argue that malice may be implied from the manner in which the death occurred (*People* v. *Morlock,* 46 Cal.2d 141 [292 P.2d 897]; *People* v. *Powell,* 34 Cal.2d 196 [208 P.2d 974]) and that the burden was thereafter on the defendant to prove circumstances in mitigation to lessen the degree or class of the crime.

In the case at bar the trial judge stated that he was of the opinion that the evidence did not establish malice beyond a reasonable doubt and to a moral certainty. In other words, he did not believe that "the evidence as a whole [was] sufficient to sustain the verdict" (*People* v. *Robarge,* 41 Cal.2d 628, 633 [262 P.2d 14]). ■ The record shows that defendant lived in great fear of being returned to Napa State Hospital where he had been incarcerated at one time at his wife's instigation; it also shows that he told the Oregon officer that he and his wife had driven into the hills and that an argument had ensued after which everything went "blooey." From this the inference is reasonable that the couple quarreled and that defendant, having lost all ability to reason, struck her the fatal blows in the heat of passion. (Pen. Code, § 192, subd. 1.) The trial judge, in judging the credibility to be given the witnesses, and the weight to be accorded the evidence, as well as the inferences to be drawn therefrom, concluded that he could not "conceive of Mr. Sheran—unless this event happened in a sudden, provoked fit of anger—having killed his wife in open view to the public." ■ The inferences drawn by him from the evidence—that Esme Sheran played upon defendant's great fear of being returned to Napa and thereby provoked a sudden quarrel in which the defendant killed her in the heat of passion—bring the case within the rule affirmed by this court in *People* v. *Valentine,* 28 Cal.2d 121, 140 [169 P.2d 1], that "The provocation which will stir in the heart of the slayer that heat of passion which reduces the homicide from murder to manslaughter must be such as would have a like effect upon the mind and emotions of the average man—the man of ordinary self-control." (*People* v. *Golsh,* 63 Cal.App. 609, 614 [219 P. 456].) We cannot say, as a matter of law, that the evidence and the inferences to be drawn therefrom, do not support the trial court's conclusion that defendant was guilty of no greater crime than manslaughter. ■ Where the only conflict consists of inferences deduced from uncontradicted probative facts, the trial

court may, on a motion for a new trial, resolve such conflicts and draw inferences opposed to those drawn by the jury at the trial. (*Mercantile Trust Co.* v. *Sunset etc. Co.,* 176 Cal. 451, 456 [168 P. 1033] ; *Cauhape* v. *Security Savings Bank,* 118 Cal. 82, 84 [50 P. 310].)

Defendant appeals from the order denying his motion for a new trial on the ground of newly discovered evidence. It appears that after the trial defendant subjected himself to two sodium pentothal examinations. As a result of these examinations and some dreams defendant thought he could recall some of his movements on May 25th. A careful scrutiny of the results of the examinations shows that defendant's recollection could have been of occurrences at any time prior to the day in question. He sought to establish that he had driven many miles around Marin County on a trip which would have taken some four or more hours and would have made it impossible for him to have committed the crime as early as six or seven in the evening. He recalled having crawled through a new fence with a bottle in each hand; that the fence was near a small oak tree. The bottles were later found at the point where he recalled having placed them, but the evidence was far from conclusive that his recollection was of the day of the crime.

To entitle a party to a new trial on the ground of newly discovered evidence it must appear that the evidence is not merely cumulative, but is material, and that it is such as to render a different result probable on retrial; and that the party could not with reasonable diligence have discovered and produced it at the trial. (*People* v. *McGarry,* 42 Cal.2d 429 [267 P.2d 254] ; *People* v. *Miller,* 37 Cal.2d 801 [236 P.2d 137].) We cannot say, as a matter of law, that a different result would have been probable on a new trial. The evidence did not fill the many gaps left open by defendant's failure to remember the occurrences of May 25th. Furthermore, no reason was given as to defendant's failure to submit to the sodium pentothal examinations prior to, or during the course of, the trial. The motion was properly denied.

The order modifying the verdict by reducing the class of the offense from second degree murder to manslaughter is affirmed. The order denying defendant's motion for a new trial is affirmed, from which it must necessarily follow that the judgment is affirmed.

Gibson, C. J., Shenk, J., Traynor, J., Schauer, J., Spence, J., and McComb, J., concurred.